**2025 WI 36**

# Supreme Court of Wisconsin



TONY EVERS, et al.,
*Petitioners*,

*v.*

HOWARD MARKLEIN, et al.,
*Respondents*.

No. 2023AP2020-OA
Decided July 8, 2025

ORIGINAL ACTION

KAROFSKY, C.J., delivered the majority opinion of the Court, in which ANN WALSH BRADLEY, DALLET, and PROTASIEWICZ, JJ., joined. HAGEDORN, J., filed an opinion concurring in part and dissenting in part. ZIEGLER, J., filed a dissenting opinion. REBECCA GRASSL BRADLEY, J., filed a dissenting opinion.

---

¶1 JILL J. KAROFSKY, C.J. The Joint Committee for Review of Administrative Rules (JCRAR) is a legislative committee with the power to pause, object to, or suspend administrative rules for varying lengths of time, both before and after promulgation, under WIS. STAT. §§ 227.19(5)(c), (d), (dm), and 227.26(2)(d), (im).[1] Here we must determine whether these statutes are unconstitutional.

---

[1] All subsequent references to the Wisconsin Statutes are to the 2021–22 version unless otherwise indicated.

¶2      Petitioners[2] (the Governor) contend that all five statutes amount to unconstitutional legislative vetoes. They assert that once an agency has complied with all statutory rulemaking requirements, JCRAR may not pause, object to, or suspend a rule's implementation without legislation. Respondents[3] (the Legislature) argue that the challenged statutes are permissible in all cases because rulemaking is an appropriate extension of legislative power. And when an agency makes a rule, it must "necessarily 'remain subordinate to the legislature with regard to their rulemaking authority.'" *Serv. Emp. Int'l Union, Loc. 1 v. Vos*, 2020 WI 67, ¶98, 393 Wis. 2d 38, 946 N.W.2d 35 [hereinafter *SEIU*] (citation omitted).

¶3      We resolve these challenges under the bicameralism and presentment requirements of the Wisconsin Constitution, WIS. CONST. ART. IV, §§ 1, 17, 19 & ART. V, § 10, which require any law to pass both houses of the Legislature and be presented to the Governor. We adopt the reasoning from *Immigration and Naturalization Service v. Chadha*, 462 U.S. 919, 952–59 (1983), in which the U.S. Supreme Court determined that bicameralism and presentment are required when legislative action alters the legal rights and duties of others outside the legislative branch. *Id.* at 952. The challenged statutes empower JCRAR to take action that alters the legal rights and duties of the executive branch and the people of Wisconsin. Yet these statutes do not require bicameralism and presentment. Therefore, we hold that each of the challenged statutes, WIS. STAT. §§ 227.19(5)(c), (d), (dm), and 227.26(2)(d), (im), facially violates the Wisconsin Constitution's bicameralism and presentment requirements.[4]

---

[2] Petitioners include the Governor, Department of Natural Resources, Board of Regents, Department of Safety and Professional Services, and the Marriage and Family Therapy, Professional Counseling, and Social Work Examining Board. For simplicity, we refer to them collectively by the lead petitioner, "the Governor."

[3] Respondents include three senators, three representatives, and the Wisconsin Legislature. For simplicity, we refer to them collectively as "the Legislature."

[4] Because we determine that WIS. STAT. §§ 227.19(5)(c), (d), (dm) and 227.26(2)(d), (im) facially violate bicameralism and presentment, we need not address petitioners' alternative separation of powers or as-applied arguments. *Md. Arms Ltd. P'ship v. Connell*, 2010 WI 64, ¶48, 326 Wis. 2d 300, 786 N.W.2d 15 ("Issues that are not dispositive need not be addressed.") (citation omitted).

¶4     We begin by reviewing the rulemaking process, JCRAR's authority, and the contested administrative rules before us. We then address two of our prior cases regarding rulemaking, and each party's arguments. After analyzing each contested statute, we conclude by explaining how each facially violates the Wisconsin Constitution.

## I. RULE PROMULGATION PROCESS AND JCRAR

¶5     The current rule promulgation process requires a series of steps, including checks from the Governor, the public, and the Legislature. All of this occurs prior to, and independent of, JCRAR's involvement. The rulemaking process begins when an agency drafts a scope statement for a proposed rule and presents it to the Governor for approval. WIS. STAT. § 227.135. Next the agency prepares an economic impact analysis, § 227.137, after which legislative council staff review the proposed rule, § 227.15. Then the proposed rule goes through a period of public hearing and comment. §§ 227.136, 227.16–.18. Following public comment, the agency submits the final proposed rule to the Governor for signature. § 227.185. After that, the agency sends the proposed rule to the chief clerk of each house of the Legislature. The chief clerks are responsible for sending the proposed rule to the appropriate standing committees, which have up to 60 days to review the proposed rule. § 227.19(3). When a standing committee's jurisdiction over the proposed rule ends, the chief clerks refer the proposed rule to JCRAR. § 227.19(5)(a).

¶6     To provide context, we briefly discuss the history of JCRAR's oversight powers, which have steadily expanded since JCRAR's inception almost 60 years ago. In 1966, the Legislature created JCRAR, a committee comprised of four senators and five assembly representatives, to participate in agency rulemaking. This bipartisan committee had a mandate to promote both public "understanding" of agency rules, and "adequate and proper rules by agencies." § 2, ch. 569, Laws of 1965, (creating WIS. STAT. § 13.56). This creation statute authorized a process for

Furthermore, we do not address the constitutionality of administrative rulemaking as neither party asks us to do so. *Halter v. Wis. Interscholastic Athletic Ass'n*, 2025 WI 10, ¶22, 415 Wis. 2d 384, 19 N.W.3d 58 ("We do not step out of our neutral role to develop or construct arguments for parties; it is up to them to make their case.") (citation omitted).

JCRAR to follow if someone lodged a complaint against a promulgated rule. First, JCRAR would hold a public hearing. Then, following public testimony, JCRAR could suspend a rule with the vote of at least six of the nine members. The committee was then obligated to place a bill before both houses of the Legislature to repeal the suspended rule. If such a bill failed, JCRAR did not have the authority to suspend the promulgated rule again. If the bill passed, the rule in question was repealed and could not be promulgated again without a law authorizing that rule.

¶7    In 1979 the Legislature expanded JCRAR's reach, granting it the power to object to rules prior to promulgation. *See* § 951, ch. 34, Laws of 1979. Whereas before JCRAR could only suspend promulgated rules, this new authority allowed JCRAR to prevent a proposed rule from becoming promulgated in the first place.

¶8    In 2017 the Legislature expanded JCRAR's powers further. Post-promulgation, JCRAR gained the ability to "suspend a rule as provided under this subsection multiple times." 2017 Act 369 § 64. This change empowered JCRAR to suspend post-promulgation rules in perpetuity. JCRAR's pre-promulgation powers also expanded. Under 2017 Act 57 § 29, JCRAR could now lodge an "indefinite" objection which rendered its decision permanent, absent passage of a law overruling the objection.

¶9    Today, JCRAR is a ten-member committee that has up to sixty days to review a rule that has otherwise completed the promulgation process, under WIS. STAT. § 227.19(5)(c). During that pre-promulgation review period, or pause, JCRAR has the power to object to executive agency rules, under § 227.19(5)(d), (dm). JCRAR also has the power to suspend all rules post-promulgation, an unlimited number of times, under § 227.26. Each of these mechanisms occurs through the majority vote of a quorum of JCRAR's committee. This means that as few as four members of JCRAR—three percent of the Legislature—may halt a rule from having effect either via an objection or a suspension.[5]

---

[5] We infer that a quorum is a "majority of the membership" of JCRAR. *See* S. Rule 99 (62); A. Rule 95 (62) (providing that a majority of a legislative committee constitutes a quorum for the purposes of performing committee business).

¶10    Having reviewed the rulemaking process and JCRAR, we next review each of the five statutory sections at issue:

- Pre-promulgation Action
      *Pre-promulgation Pause*. WIS. STAT. § 227.19(5)(c).
      *Objection*. WIS. STAT. § 227.19(5)(d).
      *Indefinite Objection*. WIS. STAT. § 227.19(5)(dm).

- Post-promulgation Action
      *Suspension*. WIS. STAT. § 227.26(2)(d).
      *Multiple Suspensions*. WIS. STAT. § 227.26(2)(im).

¶11    *Pre-promulgation Pause.* WISCONSIN STAT. § 227.19(5)(c) grants JCRAR the authority to review all administrative rules signed by the Governor before they are implemented. During this time, the agency may not promulgate a proposed rule until after JCRAR has reviewed it under § 227.19(5)(c). This review period lasts 30 days, but may be extended by an additional 30 days, or if outside of regular session, until the next day specified for the Legislature to convene. This means that *all* proposed rules automatically face a pause before promulgation.

> WIS. STAT. § 227.19(5)(c) *Agency not to promulgate rule during joint committee review.* An agency may not promulgate a proposed rule or a part of a proposed rule until the joint committee for review of administrative rules nonconcurs in the objection of the committee, concurs in the approval of the committee, otherwise approves the proposed rule or part of the proposed rule, or waives its jurisdiction over the proposed rule or part of the proposed rule under par. (d), until the expiration of the review period under par. (b) 1., if no committee has objected to the proposed rule or the part of the proposed rule, until a bill introduced under par. (e) fails to be enacted, or until a bill introduced under par. (em) is enacted. An agency may promulgate any part of a proposed rule to which no objection has been made.

¶12    *Objection.* Under WIS. STAT. § 227.19(5)(d), JCRAR may object to any proposed rule for one of seven reasons.[6] Under this provision, if

---

[6] Under WIS. STAT. § 227.19(4)(d), JCRAR can oppose the rule for any of the following seven reasons:

JCRAR objects to a proposed rule, then the proposed rule only goes into effect if the Legislature fails to pass a bill supporting the objection during the pending legislative session.[7] This statute does not set any timeline for when (or even if) the Legislature must vote on these bills. This means that any bill could languish in committee or otherwise remain inert for several months. Nonetheless, at the end of a legislative session, if the Legislature has not passed a bill supporting the objection, the agency may promulgate the rule.

---

1. An absence of statutory authority.

2. An emergency relating to public health, safety or welfare.

3. A failure to comply with legislative intent.

4. A conflict with state law.

5. A change in circumstances since enactment of the earliest law upon which the proposed rule is based.

6. Arbitrariness and capriciousness, or imposition of an undue hardship.

7. In the case of a proposed rule of the department of safety and professional services under s. 101.63 (1) establishing standards for the construction of a dwelling, as defined in s. 101.61 (1), the proposed rule would increase the cost of constructing or remodeling such a dwelling by more than $1,000. This subdivision applies notwithstanding that the purpose of the one- and 2-family dwelling code under s. 101.60 includes promoting interstate uniformity in construction standards. This subdivision does not apply to a proposed rule whose promulgation has been authorized under sub. (5) (fm).

[7]  WIS. STAT. § 227.19(5)(e) *Bills to prevent promulgation*. When the joint committee for review of administrative rules objects to a proposed rule or a part of a proposed rule under par. (d) it shall, within 30 days of the date of the objection, meet and take executive action regarding the introduction, in each house of the legislature, of a bill to support the objection. The joint committee shall introduce the bills within 5 working days after taking executive action in favor of introduction of the bills unless the bills cannot be introduced during this time period under the joint rules of the legislature.

> WIS. STAT. § 227.19(5)(d) *Joint committee action. . . .* If the joint committee for review of administrative rules objects to a proposed rule or a part of a proposed rule and invokes this paragraph, an agency may not promulgate the proposed rule or part of the proposed rule objected to until a bill introduced under par. (e) fails to be enacted. The joint committee for review of administrative rules may object to a proposed rule or a part of a proposed rule under this paragraph only for one or more of the reasons specified under sub. (4)(d).

¶13     *Indefinite objection.* Under WIS. STAT. § 227.19(5)(dm), JCRAR may issue an indefinite objection to a proposed rule, which prevents the agency from promulgating a rule unless the Legislature passes a bill enacting the rule. Said another way, legislative inertia after an indefinite objection could permanently stop the promulgation of a rule.

> WIS. STAT. § 227.19(5)(dm) *Indefinite objection; joint committee action.* If the joint committee for review of administrative rules objects to a proposed rule or a part of a proposed rule and invokes this paragraph, the agency may not promulgate the proposed rule or part of the proposed rule objected to until a bill introduced under par. (fm) is enacted. . . .

¶14     *Suspension.* Under WIS. STAT. § 227.26(2)(d), for any of the seven reasons in § 227.19(4)(d), JCRAR may suspend a rule post-promulgation. Once JCRAR suspends a rule, the same procedures applicable to an objection apply, meaning that JCRAR must meet within 30 days to propose a bill to suspend the rule. In this scenario, a rule is promulgated and goes into effect, and then JCRAR subsequently rescinds the rule, pending legislative action.

> WIS. STAT. § 227.26(2)(d) *Temporary suspension of rules.* The committee may suspend any rule by a majority vote of a quorum of the committee. A rule may be suspended only on the basis of testimony in relation to that rule received at a public hearing and only for one or more of the reasons specified under s. 227.19 (4) (d).

¶15     *Multiple Suspensions.* JCRAR may suspend a rule "multiple times" under WIS. STAT. § 227.26(2)(im). This means that even after

promulgation, JCRAR could suspend a rule repeatedly in perpetuity with no other checks in place.

> WIS. STAT. § 227.26(2)(im) *Multiple suspensions.* Notwithstanding pars. (i) and (j), the committee may act to suspend a rule as provided under this subsection multiple times.

## II. TWO CONTESTED ADMINISTRATIVE RULES

¶16    We turn now to the two rules before us, which in combination have been paused, objected to, and suspended by four of the statutes above, while remaining subject to the fifth. The first is an administrative rule of the Marriage and Family Therapy, Professional Counseling, and Social Work Examining Board (the Board) banning conversion therapy by licensees in the state, WIS. ADMIN. CODE MPSW § 20.02(25) (2022). The second is a rule intended to update the Wisconsin Commercial Building Code, WIS. ADMIN. CODE SPS §§ 361–366 (2022).

¶17    In 2019 and 2020 the Board proposed a rule that listed conversion therapy as "unprofessional conduct."[8] The rule was intended to bring licensees, including professional counselors, social workers, and marriage and family therapists, into coherence with national medical and psychological association guidance.[9]

---

[8] Conversion therapy, a colloquial term for Sexual Orientation and Gender Identity Change Efforts, generally attempts to "convert" people to a heterosexual and/or cisgender identity. *See* Douglas C. Haldeman, *The Practice and Ethics of Sexual Orientation Conversion Therapy*, 62 J. OF CONSULTING AND CLIN. PSYCH., 221–27 (1994).

[9] *See, e.g., Advocating for the LGBTQ Community*, AM. MED. ASS'N, https://www.ama-assn.org/delivering-care/population-care/advocating-lgbtq-community; *APA Resolution on Gender Identity Change Efforts*, AM. PSYCH. ASS'N (Feb. 2021), https://www.apa.org/about/policy/resolution-gender-identity-change-efforts.pdf; Anna Forsythe et al., *Humanistic and Economic Burden of Conversion Therapy Among LGBTQ Youths in the United States*, 176 JAMA PEDIATRICS 493 (2022).

¶18   In February 2020, the Governor signed and approved the rule, Wis. Admin. Code MPSW § 20.02(25) (2022). Then in June 2020, during the automatic pre-promulgation pause, JCRAR voted to record an objection to the rule. This action halted the rule for about a year and a half until December 2022. When the Legislature failed to pass a bill supporting the objection, the rule went into effect for the first time.[10]   The rule, however, did not stay in effect for long.

¶19   About six weeks later, JCRAR held a hearing. Two individuals on behalf of two organizations sought suspension of the rule, while 20 individuals appearing or registering on behalf of nine organizations spoke in support of the rule. Nonetheless by a 6-4 vote JCRAR suspended the rule under Wis. Stat. § 227.26(2)(d) on the grounds that the rule was arbitrary and capricious, and failed to comply with legislative intent.[11] In April 2024, at the end of that pending legislative session, the Legislature failed to pass a bill in both houses to permanently suspend the rule,[12] so the rule subsequently took effect. In total, JCRAR halted the rule for approximately three years, which impeded the Board from establishing the licensure standards it is statutorily entrusted to create. While this rule is in effect as of our writing, under Wis. Stat. § 227.26(2)(im), the multiple suspension provision, JCRAR has the authority to suspend this rule again, in perpetuity.

¶20   The Department of Safety and Professional Services' (DSPS) update to the commercial building code also faced barriers in the rulemaking process.[13] Wisconsin's commercial building code is regularly

---

[10] Wis. State Leg., *Clearinghouse Rule CR 19-166*, (2022). https://docs.legis.wisconsin.gov/code/register/2022/803b/register/final/cr_19_166_rule_text/cr_19_166_rule_text.

[11] Wis. State Leg., *Rec. of Comm. Procs.*, Joint Comm. for Rev. of Admin. Rules (Jan. 12, 2023), https://docs.legis.wisconsin.gov/code/register/2023/805a3/register/actions_by_jcrar/actions_taken_by_jcrar_on_january_12_2023_ch_mpsw_20/actions_taken_by_jcrar_on_january_12_2023_ch_mpsw_20.

[12] 2023 A.B. 3; 2023 S.B. 4.

[13] Wis. State Leg., *Rec. of Comm. Procs.*, Joint Comm. for Rev. of Admin. Rules (Sept. 29, 2023),

updated to comply with federal law and international guidance on a number of matters, including fire safety, accessibility and engineering requirements.[14] The goal of these chapters is to protect the health, safety, and welfare of the public under WIS. ADMIN. CODE SPS § 361.01 (2022).

¶21 In May 2023 DSPS completed its steps in the rulemaking process to update the commercial building code. The agency's proposed rule had been signed by the Governor, and submitted to the Legislature for committee referral. In August 2023 the assembly and senate committees referred the proposed rule to JCRAR. In September 2023, JCRAR voted to indefinitely object to the rule under WIS. STAT § 227.19(5)(dm).[15] JCRAR listed a number of reasons: failure to comply with legislative intent, a conflict with state law, arbitrary and capricious action, and a deficient economic impact analysis.[16] Because the Legislature has not passed a bill authorizing this rule, the code updates remain unpromulgated today.[17]

### III. PRIOR CASES

¶22 To further contextualize our analysis, we discuss two prior cases where we upheld the constitutionality of the suspension and

---

https://docs.legis.wisconsin.gov/2023/related/records/joint/administrative_rules/1748291.

[14] *See* Wis. Dep't of Safety and Prof. Servs., *Rep. to the Leg. CR 23-007*, https://dsps.wi.gov/Documents/RulesStatutes/SPS361to366LRRD.pdf (last visited June 5, 2025).

[15] Wis. State Leg., *Clearinghouse Rule CR 23-077*, https://docs.legis.wisconsin.gov/code/chr/all/cr_23_007 (last visited June 5, 2025).

[16] Wis. State Leg., *Rec. of Comm. Procs.*, Joint Comm. for Rev. of Admin. Rules CR 23-007 (Sept. 29, 2023), https://docs.legis.wisconsin.gov/2023/related/records/joint/administrative_rules/1748291.

[17] Wis. Dep't of Safety and Prof. Servs., *Pending Rules*, https://dsps.wi.gov/Pages/RulesStatutes/PendingRules.aspx (last visited June 5, 2025).

multiple suspension provisions, WIS. STAT. § 227.26(2)(d), (im). In *Martinez v. DILHR*, 165 Wis. 2d 687, 702, 478 N.W.2d 582 (1992), we held that the § 227.26(2)(d) rule suspension was allowable for three months under the Wisconsin Constitution. And in *SEIU*, we used *Martinez* as a springboard to determine that the § 227.26(2)(im) multiple suspension provision similarly "passes constitutional muster." *SEIU*, 393 Wis. 2d 38, ¶12.

¶23    *Martinez* centered on a Department of Industry, Labor and Human Relations (DILHR) rule, WIS. ADMIN. CODE IND. § 7201(16) (1990), which allowed some migrant workers to be paid a sub-minimum wage. JCRAR suspended the rule for three months, and voted to amend the rule's language to protect the wages of migrant workers who frequently changed jobs between seasonal harvests. DILHR told Wisconsin employers to ignore JCRAR's rule amendments, and subsequently challenged the constitutionality of the suspension provision in WIS. STAT. § 227.26(2)(d), arguing it violated bicameralism and presentment.

¶24    When analyzing this DILHR rule, we noted that "an administrative rule is not legislation as such." *Martinez*, 165 Wis. 2d at 699. Analyzing the creation of this rule differently than we would legislation, we determined that JCRAR's three-month rule suspension in that instance did not violate bicameralism and presentment. We found it significant that the delay was not permanent and because "sufficient procedural safeguards [we]re available to prevent unauthorized decisions by the committee." *Id.* at 702. We reasoned "[i]t is appropriate for the legislature to delegate rule-making authority to an agency while retaining the right to review any rules promulgated under the delegated power." *Id*. at 698. We further held that the suspension provision in fact "furthers bicameral passage . . . principles by imposing mandatory checks and balances on any temporary rule suspension—only the formal bicameral enactment process coupled with executive action can make permanent a rule suspension." *Id*. at 699. We noted that each of the steps in a process to suspend a rule served to provide "a legislative check on agency action which prevents potential agency over-reaching." *Id*. at 701. We described the outcome as "a cooperative venture between the legislature and administrative agencies to make and implement rules that are consistent with their statutory authorization." *Id.* at 692.

¶25    Thirty years later, one of the issues we examined in *SEIU* was a facial constitutional challenge to the multiple suspension provision, WIS. STAT. § 227.26(2)(im). 393 Wis. 2d 38, ¶¶78–83. In that case, neither party asked the court to revisit the reasoning in *Martinez*. *Id*., ¶81.

Accordingly, this court applied our earlier reasoning. "[A]n endless suspension of rules could not stand; there exists at least some required end point after which bicameral passage and presentment to the governor must occur. But also under *Martinez*, a single temporary three-month suspension is permissible." *Id*. (citation omitted). Using this guidance for temporal "boundary markers," we concluded that "if one three-month suspension is constitutionally permissible, two three-month suspensions are as well." *Id*., ¶82 (citation omitted). We described this as "a modest suspension that is temporary in nature." *Id*.

## IV. ANALYSIS

¶26 With the benefit of the history and context above, we address the question before us: whether all five statutes, WIS. STAT. §§ 227.19(5)(c), (d), (dm), and 227.26(2)(d), (im), which empower JCRAR to pause, object to, and suspend rules as discussed above, facially violate the Wisconsin Constitution. Facial constitutional challenges require a showing "that the statute cannot be enforced under any circumstances." *Evers v. Marklein*, 2024 WI 31, ¶8, 412 Wis. 2d 525, 8 N.W.2d 395 [hereinafter *Marklein I*] (citation omitted). This is a question we review de novo. *Jones v. Gerhardstein*, 141 Wis. 2d 710, 733, 416 N.W.2d 883 (1987).

### A. PARTY ARGUMENTS

¶27 The Governor argues that the challenged statutes authorize JCRAR to violate the bicameralism and presentment requirements of the Wisconsin Constitution, which require a bill to pass both houses of the Legislature and be presented to the Governor. WIS. CONST. ART. IV, §§ 1, 17, 19 & ART. V, § 10. The Governor maintains that bicameralism and presentment "cabin the immense power vested in the Legislature to enact laws." *Marklein I*, 412 Wis. 2d 525, ¶13.

¶28 Accordingly, the Governor asks us to depart from our reasoning in *Martinez* and *SEIU*, and to instead adopt the reasoning of the U.S. Supreme Court in *Chadha*, 462 U.S. at 952-59 (holding federal legislative vetoes violated bicameralism and presentment because the vetoes altered the legal rights and duties of persons outside of the legislative branch). The Governor concedes that not all legislative acts must pass through "the constitutional gauntlet of bicameralism and presentment." However, the Governor argues that when legislative action has the "purpose and effect of altering the legal rights, duties, and relations of persons . . . outside the legislative branch," then that action

must occur through lawmaking procedures under the Wisconsin Constitution. *Chadha*, 462 U.S. at 952.

¶29    Applying this reasoning from *Chadha*, the Governor argues that because JCRAR's authority under the challenged statutes has the force of law outside of the Legislature, JCRAR's power under these statutes alters the legal rights and duties of others. *See Kieninger v. Crown Equip. Corp.*, 2019 WI 27, ¶16 n.8, 386 Wis. 2d 1, 924 N.W.2d 172 ("Administrative rules enacted pursuant to statutory rulemaking authority have the force and effect of law."). Therefore, according to the Governor, all five statutes trigger the requirements of bicameralism and presentment. Because the challenged statutes bypass bicameralism and presentment, the Governor asks us to conclude that JCRAR's authority under these provisions is facially unconstitutional under Articles IV and V of the Wisconsin Constitution.

¶30    The Legislature argues that JCRAR's suspension powers under WIS. STAT. § 227.26(2)(d), (im) do not violate bicameralism and presentment. The Legislature reasons that under *Martinez*, 165 Wis. 2d 687, rulemaking suspensions differ from legislation, and consequently, rulemaking suspensions do not require bicameralism and presentment.

¶31    Relying on *Martinez* and *SEIU*, the Legislature further argues that if blocking promulgated rules does not require bicameralism and presentment, then JCRAR's authority to object to proposed rules under WIS. STAT. § 227.19(5)(d), (dm) certainly does not either. *See Martinez*, 165 Wis. 2d at 698; *SEIU*, 393 Wis. 2d 38. The Legislature reasons that if promulgated rules, which *do* have the force of law, are exempt from bicameralism and presentment, then proposed rules, which do not yet have the force of law, are also exempt. They describe all of the provisions before us as being part of the Legislature's "appropriate" rulemaking oversight authority. *Martinez*, 165 Wis. 2d at 698.

¶32    We agree with the Governor. The requirements of bicameralism and presentment are triggered when legislative action alters the legal rights and duties of others outside the legislative branch. *Chadha*, 462 U.S. at 952–57.

B.  ADOPTING THE *CHADHA* STANDARD

¶33    In *Chadha* the U.S. Supreme Court addressed a challenge to a statute permitting the House of Representatives to override the Attorney

General's decision to suspend the deportation of an individual. The Court began its analysis by describing one Framer's remarks during the Constitutional Convention: "If the Legislative authority be not restrained, there can be neither liberty nor stability; and it can only be restrained by dividing it within itself, into distinct and independent branches. In a single house there is no check, but the inadequate one, of the virtue & good sense of those who compose it." *Id.* at 949 (citation omitted). Bicameralism, the Court observed, serves the role of "assur[ing] that the legislative power would be exercised only after opportunity for full study and debate in separate settings." *Id*. at 951. Presentment likewise checks legislative power because "[t]he President's participation in the legislative process was to protect the Executive Branch from Congress and to protect the whole people from improvident laws." *Id*. The Court concluded that the Constitution's lawmaking requirements are triggered by an exercise of power that is "legislative in its character and effect." *Id.* at 952.

¶34 With those principles in mind, the Court further held that legislative action that had the "purpose and effect of altering the legal rights, duties, and relations of persons . . . outside the legislative branch," required bicameralism and presentment. *Id.* at 952. The Court concluded that the veto in question altered the legal rights and duties of "the Attorney General, Executive Branch officials and Chadha," all of whom were outside the legislative branch. *Id*. And therefore, the protections of bicameralism and presentment were inviolable. *Id*. The Court ended with an acknowledgement that these procedures have "flaws of delay, untidiness, and potential for abuse" but they provide "carefully crafted restraints" to the exercise of power which "preserve freedom." *Id.* at 959.

¶35 These same principles apply to the Wisconsin Constitution's bicameralism and presentment requirements in Articles IV and V. Here the underlying constitutional principles provide a similar "finely wrought and exhaustively considered, procedure" for the legislative branch's use of power. *Id*. (citation omitted). We have emphasized this court's obligation to safeguard "the structural separation of powers [to prevent] one branch from encroaching upon or seizing the powers of another, averting 'a gradual concentration of the several powers in the same department.'" *Marklein I*, 412 Wis. 2d 525, ¶1. (citation omitted). "[B]icameralism and presentment 'ultimately serve the same fundamental purpose: to restrict the operation of the legislative power to those policies which meet the approval of three constituencies, or a supermajority of two.'" *Id*.,¶13. (citation omitted). When the Legislature bypasses those

procedures, it removes core protections of the Wisconsin Constitution. For all the reasons stated above, we adopt the reasoning of *Chadha*.[18]

## C.  OVERRULING *MARTINEZ* AND *SEIU*

¶36     Adopting the reasoning in *Chadha* means we must overrule *Martinez*, and paragraphs 12 and 80–83 of *SEIU* which expressly rely upon *Martinez*. As a court, "we have repeatedly recognized the importance of stare decisis to the rule of law." *State v. Johnson*, 2023 WI 39, ¶19, 407 Wis. 2d 195, 990 N.W.2d 174. "Accordingly, any departure from stare decisis requries a 'special justification.'" *Priorities USA v. Wis. Elections Comm'n*, 2024 WI 32, ¶37, 412 Wis. 2d 594, 8 N.W.3d 429. And this is because "[w]e do more damage to the rule of law by obstinately refusing to admit errors, thereby perpetuating injustice, than by overturning an erroneous decision." *Johnson Controls, Inc. v. Emps. Ins. of Wausau*, 2003 WI 108, ¶100, 407 Wis. 2d 195, 990 N.W.2d 174. "[O]ne situation in which we may depart from stare decisis is when a decision is 'unsound in principle' because it 'misapplies the Wisconsin Constitution.'" *Clarke v. Wis. Elections Comm'n*, 2023 WI 79, ¶24, 410 Wis. 2d 1, 998 N.W.2d 370.

---

[18] Although we are not bound by other jurisdictions' constitutions, we note that other states have also required bicameralism and presentment when their legislatures sought to block or amend executive agency rules. *See e.g.*, *Gen. Assembly v. Byrne*, 448 A.2d 438, 448 (N.J. 1982) ("[W]e cannot allow the Legislature to create oversight mechanisms that will circumvent the constitutional procedures for making laws and interfere unduly with the Executive's constitutional responsibility to enforce them."); *State ex rel. Barker v. Manchin*, 279 S.E.2d 622, 632 (W. Va. 1981) ("The power of a small number of Committee members to approve or disapprove otherwise validly promulgated administrative regulations, and of the entire legislative body to sustain or to reverse such actions . . . reverses the constitutional concept of government whereby the Legislature enacts the law subject to the approval or the veto of the Governor."); *Mo. Coal. for Env't v. Joint Comm. on Admin. Rules*, 948 S.W.2d 125, 134 (Mo. 1997) (expressly adopting *Chadha* and holding "legislative actions, whether by committee, by resolution of one house, or by joint resolution of the whole legislature, cannot amend, modify, rescind, or supplant any rule promulgated by an agency unless the legislature follows the bill passage requirements.").

¶37 *Martinez* was unsound in principle because it misapplied our constitution in two respects. First, we held that a three-month rule suspension was constitutional without addressing why a temporary suspension of bicameralism and presentment was constitutionally firm. Instead, we focused on the potential permanence of a rule suspension, stating that "only the formal bicameral enactment process coupled with executive action can make permanent a rule suspension." *Martinez*, 165 Wis. 2d at 699. Second, we determined that the statute had "sufficient procedural safeguards" to ensure constitutional adherence in rulemaking, when we should have treated constitutional adherence itself as the principle procedural safeguard. *Id*. at 702.

¶38 *SEIU* was also unsound in principle as it compounded our error in *Martinez*. *SEIU* relied on *Martinez* to uphold the multiple suspension provision, WIS. STAT. § 227.26(2)(im). *SEIU* reasoned that "if one three-month suspension is constitutionally permissible, two three-month suspensions are as well." 393 Wis. 2d 38, ¶82. In doing so, *SEIU* failed to adhere to the Wisconsin Constitution, which makes no allowance for temporary departures from the Articles IV and V bicameralism and presentment requirements. The conclusions in both *Martinez* and *SEIU* departed from our constitutional text, which provides no exception to the bicameralism and presentment requirements when a legislative action alters the legal rights and duties of others. *See also Chadha*, 462 U.S. at 959 ("With all the obvious flaws of delay, untidiness, and potential for abuse, we have not yet found a better way to preserve freedom than by making the exercise of power subject to the carefully crafted restraints spelled out in the Constitution.").

¶39 We therefore hold that, notwithstanding any statements to the contrary in *Martinez* and *SEIU*, legislative action that alters the legal rights and duties of persons outside of the legislative branch triggers the requirements of bicameralism and presentment. *See Chadha*, 462 U.S. at 952–59.

## D. APPLICATION

¶40 We now apply *Chadha's* reasoning and examine whether each of the challenged statutes empower JCRAR with authority to take action that alters the legal rights and duties of persons outside the legislative branch. Some of the Legislature's activities, such as committee meetings, do not have any effect beyond the Legislature itself. They are not "legislative in [their] character and effect." *Id.* at 952. However, once

the Legislature's action impacts the rights and duties outside the legislative branch, the checks and balances of Articles IV and V of the Wisconsin Constitution are triggered. *See State ex. rel. Barker v. Manchin*, 279 S.E.2d 622, 633 (W. Va. 1981) And where the challenged statutes empower JCRAR with such power, we next ask whether they comply with the bicameralism and presentment requirements of the Wisconsin Constitution.

¶41     WISCONSIN STAT. § 227.19(5)(c), the pre-promulgation pause, permits JCRAR to prevent proposed rules from going into effect. Under this statute, JCRAR is empowered to act after an agency has completed the rulemaking process and submitted a proposed rule to the Governor for approval. The statute essentially allows JCRAR to capture control of agency rulemaking authority from the executive branch during the 30-day pause period under § 227.19(5)(b)(1). During that pause, JCRAR can, for example, choose exactly when agencies are permitted to promulgate rules either by exercising an approval-power (non-concurring in a committee objection or concurring in a committee approval), or by opting to waive its jurisdiction at any time. JCRAR can also choose to block rules from promulgation by extending the pause from 30 days to up to 60 days. Indeed, both the conversion therapy and building code rules underwent a pre-promulgation pause, and neither rule had statewide force during that period. In other words, this provision operates as a "pocket veto." Even if such an interruption is relatively brief, the constitution does not contemplate temporary violations of its provisions. *See Marklein I*, 412 Wis. 2d 525, ¶1 ("[T]he judiciary must ensure constitutional boundaries have not been breached."). The ability of a ten-person committee to halt or interrupt the passage of a rule, which would ordinarily be required to be presented to the governor as a bill, is simply incompatible with Articles IV and V of the Wisconsin Constitution. *See also Mo. Coal. For Env't v. Joint Comm. on Admin. Rules* 948 S.W.2d 125, 136 (Mo. 1997) (holding that Missouri legislative committee's 20-day rule review and publication pause violated Missouri's constitutional bill passage and presentment requirements). By permitting JCRAR to exercise discretion over which approved rules may be promulgated and which may not, the statute empowers JCRAR to take action that alters the legal rights and duties of persons outside of the legislative branch, triggering the requirements of bicameralism and presentment. Because § 227.19(5)(c) bypasses bicameralism and presentment, it is facially unconstitutional.

¶42     WISCONSIN STAT. § 227.19(5)(d), (dm), the two pre-promulgation statutes, allow JCRAR to object to a proposed rule

temporarily or indefinitely, halting an agency's legislatively-delegated rulemaking powers. The conversion therapy rule exemplifies this. Under WIS. STAT. § 457.03(2), the Board must "promulgate rules establishing a code of ethics to govern the professional conduct of certificate holders and licensees." When the Board created new professional conduct rules banning conversion therapy, it exercised its statutory authority. But when JCRAR objected to the rule it effectively blocked the Board's authority under § 457.03(2) to govern the professional conduct of its licensees. The same analysis applies to the DSPS building code updates under WIS. STAT. ch. 101. There, JCRAR's indefinite objection under § 227.19(5)(dm) prevented DSPS from completing its statutory rulemaking duties. The JCRAR objections halted both of these proposed rules, preventing two agencies from carrying out their statutorily-delegated duties. Sections 227.19(5)(d), (dm) allow JCRAR to take legislative action that alters the legal rights and duties of persons outside of the legislative branch, triggering the requirements of bicameralism and presentment. Because these two statutes do not require bicameralism and presentment, they are facially unconstitutional.

¶43 The post-promulgation suspensions, WIS. STAT. § 227.26(2)(d), (im), allow JCRAR to suspend promulgated agency rules pending the passage of bills for up to a full legislative session, and these suspensions may be repeated in perpetuity. The effect of these suspensions on the rights and duties of persons outside of the legislative branch is incontrovertible. For example, when the Legislature suspended WIS. ADMIN. CODE MPSW § 20.02(25) (2022) under § 227.26(2)(d), licensed professionals were able to practice conversion therapy, an approach the Board had previously banned statewide. Section 227.26(2)(im) amplifies § 227.26(d), empowering JCRAR to repeat subsection (d) in perpetuity. Sections 227.26(2)(d), (im) empower JCRAR to take legislative action that alters the legal rights and duties of persons outside of the legislative branch, triggering the requirements of bicameralism and presentment. Sections 227.26(2)(d), (im) do not require bicameralism and presentment, so they each are facially unconstitutional.

¶44 Before concluding we note that the Legislature retains power over the administrative rulemaking process regardless of our determination here. The Legislature created the current process. It alone maintains the ability to amend, expand, or limit the breadth of administrative rulemaking in the other branches—as long as it adheres to the constitution, including the provisions of bicameralism and presentment.

## IV. CONCLUSION

¶45    The bicameralism and presentment requirements of the Wisconsin Constitution cabin the Legislature's otherwise vast lawmaking powers. *See Marklein I*, 412 Wis. 2d 525, ¶13. Legislative action that alters the legal rights and duties of persons outside of the legislative branch triggers the requirements of these constitutional mandates. The challenged statutes, WIS. STAT. §§ 227.19(5)(c), (d), (dm) and 227.26(2)(d), (im), empower JCRAR to take action that alters legal rights and duties outside of the legislative branch. Because the statutes do not require bicameralism and presentment, §§ 227.19(5)(c), (d), (dm) and 227.26(2)(d), (im) are facially unconstitutional.

*By the Court.*—Rights declared.

BRIAN K. HAGEDORN, J., concurring in part and dissenting in part.

¶46     This case raises a host of difficult questions about the nature of administrative rules and their role within our constitutional structure. Answering them is further complicated by the fact that this court accepted the case as an original action, depriving us of the winnowing and refining effect of the normal litigation process. We now have arguments before us by the Governor and the Legislature that do not provide a sound basis for a principled decision based on the original meaning of the Wisconsin Constitution. The majority adopts one of those arguments in an opinion that is devoid of legal analysis and raises more questions than it answers. Rather than issue a sweeping ruling on an uncertain foundation, I would decide this case narrowly, apply our precedent, and save for another day the deeper questions that are insufficiently addressed by the parties and the majority.

## I. THE PARTIES' DEFICIENT ARGUMENTS

¶47     Lest we forget what brought us here, the issues before us concern the ability of the Joint Committee for Review of Administrative Rules (JCRAR) to object to or suspend two administrative rules—a building code rule and an ethical rule for therapists concerning conversion therapy. The Governor brings two types of constitutional challenges to these actions. First, he argues that the statutes granting JCRAR objection and suspension powers cannot be constitutionally applied under any circumstances. We call this a facial challenge. Alternatively, he contends that these specific actions are unconstitutional; this is an as-applied challenge.

¶48     The complications with and consequences of the Governor's facial challenge cannot be overstated. Although pitched as a narrow set of questions, the Governor's proposed solutions offer nothing less than a constitutional revolution. As I stated in my dissent from the court's order granting this original action, a "decision in this case could occasion a historic shift—both in the operation of state government, and in how this court interprets the boundary lines between the branches of government." *Evers v. Marklein*, No. 2023AP2020-OA, unpublished order, at 4 (Wis. Feb. 2, 2024) (Hagedorn, J., dissenting). And under any of the Governor's broad theories underlying his facial challenge, it would. The Governor asks us to reconsider the constitutional foundation of the administrative state by opining either explicitly or implicitly on the nature of

administrative rules—an integral feature of modern government that is theoretically complex, hotly debated, and functionally significant.[1]

¶49 It may very well be that it is time to rethink the administrative state. We have received similar requests for a constitutional reset by others. *See, e.g.*, *Becker v. Dane County*, 2022 WI 63, 403 Wis. 2d 424, 977 N.W.2d 390. And in those appeals, I have urged that we proceed cautiously, carefully rooting our doctrinal analysis in the original meaning of the constitution. *Id.*, ¶50 (Hagedorn, J., concurring). In this case, however, the Governor has not provided us with answers to the broader questions his theories raise. He does not ground his arguments about the role and constitutionality of administrative rules in the original meaning of our constitution. Nor does he wrestle with the obvious separation of powers implications of his bicameralism and presentment argument.[2]

---

[1] Judges and scholars here and elsewhere fervently disagree over the nature and constitutionality of rulemaking within the modern administrative state. *See, e.g.*, *City of Arlington, Tex. v. F.C.C.*, 569 U.S. 290, 304 n.4 (2013) (Justice Scalia, writing for the court, arguing against Chief Justice Roberts's dissent, whereby the Chief Justice called rulemaking an exercise of legislative power and Justice Scalia states that it is an exercise of executive power); *Evers v. Marklein*, 2024 WI 31, ¶¶51–53, 412 Wis. 2d 525, 8 N.W.3d 395 (Rebecca Grassl Bradley, J., concurring) (suggesting that rulemaking is delegated legislative authority); *id.*, ¶73 (Dallet, J., concurring) ("[I]t is unsettled whether executive branch agencies exercise legislative power at all when they execute a statute within the bounds set by the legislature, including by making administrative rules pursuant to legislative authorization."); Philip Hamburger, Is Administrative Law Unlawful? 378 (2014) (stating that a "subdelegation problem . . . arises primarily where Congress authorizes others to make legally binding rules, for this binding rulemaking, by its nature and by constitutional grant, is legislative"); Eric A. Posner & Adrian Vermeule, *Interring the Nondelegation Doctrine*, 69 U. Chi. L. Rev. 1721, 1723 (2002) (arguing that "a statutory grant of authority to the executive branch or other agents can *never* amount to a delegation of legislative power. A statutory grant of authority to the executive isn't a *transfer* of legislative power, but an *exercise* of legislative power. Conversely, agents acting within the terms of such a statutory grant are exercising executive power, not legislative power.").

[2] The Governor's nearsighted arguments in this case serve to highlight once again the importance of allowing cases to make their way to this court through the normal course. As I said in the dissent to the grant order:

¶50 In addition, under his broader theories, the Governor asks that we declare the statutes facially unconstitutional. This is a tall ask in any case, but especially when the constitutional implications for such a declaration are so momentous. Administrative rules come in a lot of packages. Some are simply interpretations of a statutory term. Some are procedures to implement a statutory command. Some outline how to complain or object to agency action. And some administrative rules constitute far-reaching policy decisions. Are all of these executive in nature? Or is rulemaking purely a delegation of legislative power? Is it sometimes both? And if it is at least sometimes legislative, what would be the basis for determining what the Legislature can retain control over? Some have suggested administrative rules can also impinge on the judicial power. How does this fit into the analysis? Moreover, if rulemaking is—even in part—a delegation of authority from the Legislature to the executive, is that kind of broad delegation even constitutional in the first place? Yet here, the Governor skips right by the hard stuff, hoping his proposed theories can avoid swimming in these deeper doctrinal waters. They cannot. The Governor simply does not offer much of anything on these questions, nor does he reckon with the different answers found in the many Wisconsin authorities that have examined these issues.[3]

---

> [T]he litigation process can prove to hone, winnow, and refine. As a case works its way through the lower courts, ill-fitting issues and arguments may fall away, leaving only the sharpest, most well-developed points for appellate courts to consider. Multiple rounds of briefing may lead to the discovery of additional authorities and revised theories. This helps ensure that our decisions rest on arguments that have been thoroughly vetted.

*Evers v. Marklein*, No. 2023AP2020-OA, unpublished order, at 4 (Feb. 2, 2024) (Hagedorn, J., dissenting).

[3] *Compare State ex rel. Buell v. Frear*, 146 Wis. 291, 305, 131 N.W. 832 (1911) (finding that prescribing the executive to make rules about the civil service was "purely administrative action to make concrete application of the legislative classification of the service, and to put into effect the general rules prescribed by the statute"), *and* 63 WIS. OP. ATT'Y GEN. 159, 162 (1974) ("[A]dministrative rules do not create laws but are exercises of powers pursuant to existing laws."), *with* 43 WIS. OP. ATT'Y GEN. 350, 353 (1954) (regarding rules as functional equivalents of statutes), *and Koschkee v. Taylor*, 2019 WI 76, ¶12, 387 Wis. 2d 552, 929 N.W.2d 600 ("[W]hen administrative agencies promulgate rules, they are

¶51   The Legislature's approach is no different in this regard. The Legislature relies entirely on the functionalist approach this court adopted in *Martinez v. DILHR*, 165 Wis. 2d 687, 699, 478 N.W.2d 582 (1992). Its basic argument to us is not that the power to object to or suspend administrative rules is consistent with the original meaning of the Wisconsin Constitution. Instead, the Legislature contends that we should stay the course. Given our prior blessing of the gentlemen's agreement whereby the executive and legislative branches blend and share powers, we should, in essence, abandon the project of policing the boundaries between the branches—at least when it concerns administrative rules. This approach is, to my mind, no more satisfying than the Governor's far-reaching arguments.

## II.  THE MAJORITY'S DEFICIENT ANSWER

¶52   Nonetheless, the majority adopts the Governor's invitation to strike down the Legislature's actions as a facial matter. The majority adopts a new test borrowed from a standard created by the U.S. Supreme Court in a different kind of case presenting different questions. Without any analysis or effort to interpret the text of our constitution, the majority simply declares this new legal test applies under the Wisconsin Constitution. Yet we have repeatedly instructed litigants that if they want to make an argument based on our constitution, they need to do the work of actually analyzing it on its own terms. *See State v. Halverson*, 2021 WI 7, ¶24, 395 Wis. 2d 385, 953 N.W.2d 847; *State v. Roberson*, 2019 WI 102, ¶56, 389 Wis. 2d 190, 935 N.W.2d 813. The majority fails to heed our directive; it doesn't even try to engage with the meaning of our constitution's language.

¶53   In addition, bicameralism and presentment are the shorthand terms for the constitution's process by which a bill becomes a law—that is, a statute. To become a statute, a bill must be passed by both houses and presented to the Governor. But administrative rules are not statutory law. Rather, administrative rules are downstream from statutes—subject to them and promulgated pursuant to their direction.

---

exercising legislative power that the legislature has chosen to delegate to them by statute.").

4

The majority never explains why the constitutionally prescribed process for enacting legislation determines what the Legislature may or may not do in changing or objecting to rules promulgated pursuant to that enacted law.

¶54     The majority's reasoning also appears self-contradictory. It adopts *Chadha*'s language that legislative action must go through bicameralism and presentment when it alters the legal rights and duties of persons outside the legislative branch. The majority then says pre-promulgation pauses are unconstitutional legislative acts without bicameralism and presentment because they affect the legal rights and duties of the executive officials who have been charged with enforcing the laws that require rulemaking. This argument only makes sense if rulemaking is an executive power the legislature cannot interfere with. In other words, this argument implicitly categorizes rulemaking as an exercise of executive power. But then the majority says that post-promulgation suspensions are unconstitutional legislative acts without bicameralism and presentment because they affect the legal rights and duties of those who would be subject to the rule. This argument only makes sense if pausing a rule is a legislative act. In other words, this line of reasoning implicitly categorizes rules as an exercise of legislative power. So which is it?

¶55     Furthermore, the majority's approach imposes a kind of double standard it does not explain. The effect of the majority's decision is to greenlight *executive* alteration of legal rights and duties outside the lawmaking process while prohibiting *legislative* alteration of legal rights and duties outside the lawmaking process. It isn't clear why the executive would be allowed to legislate in any way under our constitution. Even setting that aside, why wouldn't the constitutional requirements for changing the law apply to both branches of government?

¶56     The majority's rationale, which it neither supports nor explains, raises more questions than it answers. It attempts a narrow resolution to this case, but it does not recognize the hornet's nest of constitutional issues implicated by its ill-considered solution.

## III.  THE PATH OF JUDICIAL MODESTY

¶57     In my judgment, this cries out for judicial humility and restraint. We need not sidestep the issue, but we should proceed with caution, going only as far as we must to decide it correctly. This

universally accepted rule speaks here: "cases should ordinarily be decided on narrow grounds, reaching only what is necessary to decide the case." *James v. Heinrich*, 2021 WI 58, ¶58, 397 Wis. 2d 517, 960 N.W.2d 350 (Hagedorn, J., concurring). This derives from the premise that the judiciary's primary role is to decide cases between parties, rendering constitutional judgments "only out of the necessity of adjudicating rights in particular cases between the litigants." *Id.*, ¶57 (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 611 (1973)). Justice Scalia warned of the "overjudicialization of the processes of self-governance"—a risk particularly acute when nearly every political and policy fight now seems to end up in court. Antonin Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers*, 17 SUFFOLK U. L. REV. 881, 881 (1983). To be sure, this case raises important separation of powers questions that this court is right to address in the proper case. But neither the Governor nor the majority persuasively demonstrate why a broad ruling is warranted here.

¶58 In that spirit, a relatively clear and correct answer to the dispute before us readily presents itself. The Governor challenges the constitutionality of the statutes allowing JCRAR to suspend promulgated rules and to indefinitely object to a proposed rule as applied to two specific rules.

¶59 The first is a challenge to JCRAR's objection and subsequent suspension of a rule concerning ethical standards for therapists and social workers around conversion therapy. But this ethical rule is already in effect; it is no longer suspended. Since a ruling on JCRAR's actions with respect to this rule would have no legal effect, this claim is moot, and we have nothing further to decide. *See In re John Doe Proceeding*, 2003 WI 30, ¶18, 260 Wis. 2d 653, 660 N.W.2d 260 ("It is well settled that a case is moot when a determination is sought on a matter which, when rendered, cannot have any practical legal effect upon an existing controversy.").

¶60 This leaves the challenge to JCRAR's indefinite objection to the commercial building standard rule under WIS. STAT. § 227.19(5)(dm), (em). An indefinite objection allows JCRAR to prevent the promulgation of a proposed rule unless and until the full Legislature passes a bill specifically "authoriz[ing] promulgation." § 227.19(5)(dm), (em). In September 2023, JCRAR voted to object indefinitely to the Department of Safety and Professional Services' rule updating commercial building code standards. Since then, the Legislature has failed to pass a bill authorizing

the rule's promulgation. The rule, therefore, cannot move forward and the whole Legislature may never weigh in on JCRAR's decision to halt it.

¶61    JCRAR's indefinite objection to the commercial building code rule is unconstitutional under this court's decision in *Martinez*. At oral argument, the Legislature seemed to concede as much.[4] In *Martinez*, we held that the statutory scheme at issue there was constitutional because of its "mandatory checks and balances on any temporary rule suspension." *Martinez v. DILHR*, 165 Wis. 2d 687, 699, 478 N.W.2d 582 (1992). While the Legislature had authority to suspend a rule, it could only do so temporarily. *Id*. A rule could be permanently suspended only through "the formal bicameral enactment process coupled with executive action." *Id*. It was "critical" that permanent suspension required "[t]he full involvement of both houses of the legislature and the governor." *Id*. at 700. A bill had to be introduced in the month following JCRAR suspension of a rule, and if it was defeated, the rule went into effect and could not be suspended further. *Id*.

¶62    Several of the safeguards present in *Martinez* are absent here. While *Martinez* dealt with a post-promulgation rule suspension that would eventually have to go through bicameralism and presentment, the indefinite objection prevents a proposed rule from being promulgated in the first place. For almost two years, JCRAR has prevented the proposed rule from moving forward in the promulgation process with no end in sight. The objection here involves action only by a committee and has not had the "full involvement of both houses of the legislature and the governor." *Id*. Under *Martinez*, if the Legislature failed to pass a timely bill into law, the rule went into effect. But here, a bill has not and need not be voted on, and the rule will still never proceed through the promulgation process. JCRAR's action on the commercial building code is, for all practical purposes, a complete committee veto of a nascent rule without the additional checks and balances required by *Martinez*.

---

[4] Counsel for the Legislature appeared to concede that it does not have an argument under *Martinez* for the constitutionality of an indefinite objection with no bicameralism and presentment in sight. *See* Oral Argument in *Evers v. Marklein*, No. 2023AP2020-OA, held Jan. 16, 2025, available on Wisconsin Eye https://wiseye.org/2025/01/16/wisconsin-supreme-court-tony-evers-v-howard-marklein/ (Argument of Attorney Misha Tseytlin at 1:12:12).

¶63    Thus, while the more functionalist approach to the separation of powers in *Martinez* does not sit well with our more recent jurisprudence, we need not reconsider the case to provide the Governor relief.[5] *Martinez* already controls the outcome in the Governor's favor. Under *Martinez*, JCRAR's indefinite objection to the building code rule was unconstitutional.

¶64    I therefore concur in part and dissent in part, finding that the statute authorizing JCRAR's indefinite objection was unconstitutionally applied to the proposed commercial building code rule. We have no reason to go further based on the claims in this case, and I would not do so.

---

[5] The Legislature asks us to double down on the reasoning of *Martinez*. As I've explained, applying that case means the Legislature loses in part. But I do not go so far as to endorse the constitutional reasoning underlying *Martinez*. That decision was less concerned with the formal separation of powers than the functional balance between them. Its solution to the question of whether administrative rules could be suspended was therefore less about ensuring each branch stayed in its lane and more concerned with whether a proper system of checks and balances was present.

To be sure, in practice, the separation of powers results in each branch serving as a check on the others. However, this does not mean that the constitution is complied with simply because the branches can sufficiently check each other. This confuses the effect of the constitution's design for its substance. As a court tasked with applying the constitution, our role is not to make sure the branches are appropriately balanced or empowered to reign in the abuses of coordinate branches. Rather, the constitutional question is whether the branches remain separate by carrying out their core constitutional responsibilities, and not those of the other branches.

ANNETTE KINGSLAND ZIEGLER, J., dissenting.

¶65    Today continues this court's misguided quest to restructure and unbalance our state government, culminating in even more power and control being allocated to the executive branch. The majority announces—with absolutely no analysis of the Wisconsin Constitution's text—that the Joint Committee for Review of Administrative Rules (JCRAR) may not lawfully object to proposed administrative rules or suspend existing administrative rules, declaring WIS. STAT. §§ 227.19(5)(d) and (dm) and 227.26(2)(d) and (im) facially unconstitutional.[1] Majority op., ¶¶42–43. To do so, this court overrules two decisions of this court that have—for decades—sanctioned the legislature's choice to grant JCRAR power to oversee administrative rulemaking. *Martinez v. DILHR*, 165 Wis. 2d 687, 478 N.W.2d 582 (1992); *Serv. Emps. Int'l Union, Loc. 1 v. Vos*, 2020 WI 67, 393 Wis. 2d 38, 946 N.W.2d 35; majority op., ¶¶36–39.[2] For over three decades, all three branches of government in Wisconsin have operated with the understanding that JCRAR may lawfully review rulemaking undertaken by the executive branch. With the stroke of a pen, that practice is invalidated.

¶66    The majority has created a grave constitutional imbalance by strictly construing, and thus confining, the constitutional powers of the legislative branch while not doing the same when it comes to the power of the executive branch. It might be one thing if the majority sought to resurrect and consistently enforce the Wisconsin Constitution's original meaning, as Justice Rebecca Grassl Bradley argues in her dissent. *See, e.g.*, Justice Rebecca Grassl Bradley's dissent, ¶82; *see also Evers v. Marklein*, 2024 WI 31, ¶¶51, 56, 59, 412 Wis. 2d 525, 8 N.W.3d 395 (*Marklein I*) (Rebecca Grassl Bradley, J., concurring). But the majority does no such thing. Instead, inconsistent application of constitutional principles seems to be just fine with the majority. Obtaining preferred results appears more important than the rule of law. And this case is not an outlier. Recent

---

[1] The majority also determines that the pre-promulgation pause found in WIS. STAT. § 227.19(5)(c) is facially unconstitutional. Majority op., ¶41.

[2] Specifically, the majority overrules paragraphs 12 and 80–83 of *Service Employees International Union, Local 1 v. Vos*, 2020 WI 67, 393 Wis. 2d 38, 946 N.W.2d 35. Majority op., ¶36.

decisions of this court consolidate power in one branch of government, the executive branch (which is currently controlled by members of the Democratic Party), and diminish the power of another branch, the legislative branch (which is currently controlled by members of the Republican Party). The majority's delivery of results for one branch of government and one political party is where the majority's consistency begins and ends.

¶67 This particular judicial misadventure began last term when the Governor, among others, filed an original action petition with this court. The original action petition set forth three issues and asked this court to fundamentally reshape the structure our state government. Curiously, instead of addressing all three of the issues raised by the original action petition together, the court chose to deal with the issues piecemeal. In the court's first decision, it strictly applied separation of powers principles against the legislature and limited its power. *Marklein I*, 412 Wis. 2d 525, ¶5. The court held that the Joint Committee on Finance's statutory authority to block certain spending decisions made by the Department of Natural Resources violated the Wisconsin Constitution because it is core executive authority to spend funds that have been appropriated to the executive branch. *Id.*, ¶24. In other words, the court restricted the legislature's ability to ensure that appropriated funds are being properly spent.

¶68 At that time, I voiced concern that addressing the issues separately might portend disparate application of constitutional principles, namely, applying strict restrictions on the power of the legislative branch while not applying the same standard to the executive branch. I dissented from granting the Governor's original action petition and I dissented in *Marklein I. Id.*, ¶81 (Ziegler, C.J., dissenting). As I explained in my dissent in *Marklein I*, it was an error to separate the issues presented in the original action petition as separating the issues could, among other things, create mischief. I cautioned that there was "no assurance that constitutional principles . . . will be equally applied, in the same manner, across the board, to the other branches in the future." *Id.*, ¶¶82–83. And I was not the only justice in *Marklein I* that voiced concern that a majority of justices on this court might not apply constitutional principles consistently to each branch of government. Indeed, the justice who authored the majority opinion in *Marklein I* stated that my concerns were "well founded" because "three members of the majority (Justices Ann Walsh Bradley, Rebecca Frank Dallet, and Jill J. Karofsky) have

invariably ruled against the legislature and in favor of the executive branch." *Id.*, ¶57 (Rebecca Grassl Bradley, J., concurring) (collecting cases).

¶69 Following this court's decision in *Marklein I*, this court dismissed one of the remaining two issues presented in the Governor's original action petition. The sole remaining issue is now being addressed: whether JCRAR may lawfully oversee administrative rulemaking. This court's precedent has for decades instructed that JCRAR may lawfully do so; the majority now decides it may not. So much for precedent.[3]

¶70 I dissented from granting the Governor's original action petition, I dissented in *Marklein I*, and I dissent now. Today the majority again ends a "practice [that] has been approved, tacitly or explicitly, by all three branches of government" for longer than some members of today's majority have been lawyers. *Id.*, ¶86 (Ziegler, C.J., dissenting); *see also Martinez*, 165 Wis. 2d 687. The legislature has delegated executive branch agencies broad rulemaking authority with the understanding that it will be able to oversee administrative rulemaking through JCRAR. The majority now pulls the rug out from under the legislature,[4] despite the fact that this could significantly impact the current budget cycle—which is well underway. The majority, with its unequal application of constitutional principles and the timing of its decision at the near end of the budget cycle, could create havoc. The majority's reasons for creating this sea change in the law are not compelling, particularly because the majority applies some constitutional principles strictly to the legislative branch, but not at all to the executive branch. So much for equal justice under the law in Wisconsin.

---

[3] The four justices in today's majority have been "downright aggressive" in overturning precedents of this court with which they disagree. *LeMieux v. Evers*, 2025 WI 12, ¶93 n.7, 415 Wis. 2d 422, 19 N.W.3d 76 (Hagedorn, J., dissenting) (citation omitted); *Clarke v. WEC*, 2023 WI 79, 410 Wis. 2d 1, 998 N.W.2d 370 (overruling *Johnson v. WEC*, 2021 WI 87, 399 Wis. 2d 623, 967 N.W.2d 469, *Johnson v. WEC*, 2022 WI 14, 400 Wis. 2d 626, 971 N.W.2d 402, and *Johnson v. WEC*, 2022 WI 19, 401 Wis. 2d 198, 972 N.W.2d 559); *Waukesha County. v. M.A.C.*, 2024 WI 30, 412 Wis. 2d 462, 8 N.W.3d 365 (overruling *Waukesha County v. S.L.L.*, 2019 WI 66, 387 Wis. 2d 333, 929 N.W.2d 140); *Priorities USA v. WEC*, 2024 WI 32, 412 Wis. 2d 594, 8 N.W.3d 429 (overruling *Teigen v. WEC*, 2022 WI 64, 403 Wis. 2d 607, 976 N.W.2d 519).

[4] *See* Justice Rebecca Grassl Bradley's dissent, ¶87.

¶71    For starters, in concluding that JCRAR may not oversee administrative rulemaking, the majority surmises that the statutes providing JCRAR with the authority to oversee administrative rulemaking facially violate the bicameralism and presentment requirements found in the Wisconsin Constitution. The majority, however, spends no time on the text of the Wisconsin Constitution: *None.*[5] The majority, instead, adopts the test for what triggers bicameralism and presentment under the Constitution of the United States as articulated in *INS v. Chadha*: actions that have "the purpose and effect of altering the legal rights, duties and relations of persons . . . outside the legislative branch." 462 U.S. 919, 952 (1983).[6] But the majority completely fails to explain why it finds *Chadha* persuasive and how *Chadha*'s analysis of the Constitution of the United States informs the Wisconsin Constitution.[7] The majority merely describes the United States Supreme Court's decision in *Chadha*, recites the general purposes of bicameralism and presentment, and unceremoniously announces "we adopt the reasoning of *Chadha*." Majority op., ¶¶33–35.

---

[5] *Contra Wis. Just. Initiative, Inc. v. WEC*, 2023 WI 38, ¶21, 407 Wis. 2d 87, 990 N.W.2d 122 (stating constitutional interpretation "focus[es] on the constitutional text, reading it reasonably, in context, and with a view of the provision's place within the constitutional structure" (citation omitted)). The majority does not even bother to provide the text of the pertinent provisions of the Wisconsin Constitution, as would normally be done even in cases where the court ultimately ignores the actual text at issue. *See, e.g.*, *LeMieux*, 415 Wis. 2d 422, ¶¶12–24.

[6] *See also* Justice Hagedorn's concurrence/dissent, ¶52 (noting the majority's analysis focuses exclusively on *Chadha*); Justice Rebecca Grassl Bradley's dissent, ¶95 (same).

[7] *Chadha* has sustained continuous criticism since it was decided. Miriam Seifter, *State Legislative Vetoes and State Constitutionalism*, 99 N.Y.U. L. REV. 2017, 2041 (2024) (noting some of the criticism); *see also Mead v. Arnell*, 791 P.2d 410, 417–18 (Idaho 1990) (adopting the reasoning of Justice White's dissent in *Chadha*). This court has been requested to adopt the United States Supreme Court's analysis in *Chadha* many times, and we have, until today, refused to do so. *See, e.g.*, *Martinez v. DILHR*, 165 Wis. 2d 687, 699, 478 N.W.2d 582 (1992). The majority provides no reason for adopting *Chadha*'s analysis now.

The majority's analysis is sorely lacking.[8] One would normally expect more—*much more*—from a court upending decades of precedent that has been relied upon by the other branches of government to structure how our state government operates.[9]

¶72 Worse than the majority's shallow analysis is the majority's uneven application of constitutional principles. The majority strictly applies limits to the legislative branch, while leaving the executive branch free from any such strict application of constitutional principles. This disparate application is profound because it redistributes power unevenly, placing a judicial thumb on the scale to the benefit of the majority's preferred branch of government.

¶73 The principles the majority applies in this case, if applied equally to all branches of government, would render administrative rulemaking unconstitutional. *See Chadha* 462 U.S. at 985–86 (White, J., dissenting).[10] Administrative rulemaking authority, as this court has held for nearly a century, is delegated legislative power. *State ex rel. Wis. Inspection Bureau v. Whitman,* 196 Wis. 472, 220 N.W. 929 (1928); *Koschkee v. Taylor,* 2019 WI 76, ¶15, 387 Wis. 2d 552, 929 N.W.2d 600. "Administrative rules . . . have the force and effect of law in Wisconsin." *State ex rel. Staples v. DHSS*, 115 Wis. 2d 363, 367, 340 N.W.2d 194 (1983) (citations omitted). Rulemaking is essentially legislating done by the executive branch. But administrative rules do not go through the constitutional procedure of

---

[8] *See State v. Halverson*, 2021 WI 7, ¶24, 395 Wis. 2d 385, 953 N.W.2d 847 ("While we must follow the United States Supreme Court on matters of federal law, we have an independent responsibility to interpret and apply the Wisconsin Constitution." (citing *State v. Jennings*, 2002 WI 44, ¶¶18, 38, 252 Wis. 2d 228, 647 N.W.2d 142)); *id.*, ¶24 ("[A]ny argument based on the Wisconsin Constitution must actually be grounded in the Wisconsin Constitution." (first citing *State v. Roberson*, 2019 WI 102, ¶56, 389 Wis. 2d 190, 935 N.W.2d 813; and then citing *Jennings*, 252 Wis. 2d 228, ¶¶38–39)).

[9] *See Johnson Controls, Inc. v. Emps. Ins. of Wausau*, 2003 WI 108, ¶94, 264 Wis. 2d 60, 665 N.W.2d 257 (stating that precedents should never be overruled "'casually'" (quoting *State v. Stevens*, 181 Wis. 2d 410, 442, 511 N.W.2d 591 (1994) (Abrahamson, J., concurring))).

[10] *See also* Justice Rebecca Grassl Bradley's dissent, ¶93.

bicameralism and presentment. Accordingly, under the principles laid out by the majority, administrative rulemaking would be unconstitutional. Notably, if the court applied the principles it espouses consistently, there would be no need for JCRAR to oversee administrative rulemaking: there would be no administrative rules to review.[11] Equal application of the principles applied to the legislature would seem to spell the destruction of the administrative state as we know it. But the majority makes clear that the executive branch is exempt from the constitutional constraints the majority strictly applies to the legislative branch. Majority op., ¶40.[12] Such one-sidedness coming from a court cannot be condoned.[13]

\* \* \*

¶74    "While some members of this court may prefer (for now) the executive branch to the legislative, [our] constitution does not." *Marklein I*, 412 Wis. 2d 525, ¶59 (Rebecca Grassl Bradley, J., concurring). Constitutional principles must be applied consistently, not opportunistically. When the court fails to enforce the constitution equally to each branch of our state government, the constitutional balance of powers distributed between the branches is grossly distorted. Unfortunately, a majority of the court is unwilling to solemnly and consistently apply constitutional principles to each branch of government. This is dangerous. The majority has created a grave imbalance in our delicate system of checks and balances, holding the legislature to constitutional principles strictly while not even beginning to apply them

---

[11] The majority could have, and should have, required the parties to address what impact adopting *Chadha*'s reasoning would have on administrative rulemaking. *See* Wis. Stat. § (Rule) 809.62(6). The majority surely would have done so if it wished to seriously consider the constitutional principles it now adopts and applies to the legislature alone.

[12] *See also* Justice Hagedorn's concurrence/dissent, ¶55 (noting the majority's "double standard"); Justice Rebecca Grassl Bradley's dissent, ¶94 (same).

[13] Under the majority's reasoning, this court likely should not be able to engage in rulemaking either. *See* Wis. Stat. § 751.12; Wis. Const. art. VII, § 3(1). Surely, the majority likewise exempts this court from the principles it strictly applies to the legislature.

to the executive branch. Our court should exercise restraint. Now is not the time to unleash a sea change in the law regarding how our state government is structured, and there should never be a time to unequally apply the constitution.

¶75 For the foregoing reasons, I dissent.

REBECCA GRASSL BRADLEY, J., dissenting.

¶76    "And a king ain't satisfied 'til he rules everything."
BRUCE SPRINGSTEEN, *Badlands*, *on* DARKNESS ON THE EDGE OF TOWN (Columbia Records 1978).

The majority invokes the Wisconsin Constitution to take power from the People's elected representatives in the legislature and bestow it on the executive branch, empowering unelected bureaucrats to rule over the People. This distorted conception of the constitution enshrines rule by bureaucratic overlords and "leaves Americans at the mercy of administrative agencies" endowed with "a nearly freestanding coercive power" making the agencies "rulers of a sort unfamiliar in a republic, and the people must jump at their commands." PHILIP HAMBURGER, IS ADMINISTRATIVE LAW UNLAWFUL? 335 (2014). Progressives like to protest against "kings"—unless it is one of their own making.

¶77    Although administrative rules have the force and effect of law,[1] the majority holds the legislature to the constitutional prerequisites for lawmaking—bicameralism and presentment—but lets the executive branch exercise lawmaking power unfettered and unchecked. Nothing in the constitution sanctions such a sidestepping of the legislature's exclusive lawmaking authority. Nowhere in the constitution did the people of Wisconsin consent to be governed by rules imposed by the administrative state rather than laws passed by their elected representatives.

¶78    The Wisconsin Constitution restricts lawmaking to the People's representatives in the assembly and the senate, requiring every law to begin with the following words: "The people of the state of Wisconsin, represented in senate and assembly, do enact as follows[.]" WIS. CONST. ART. IV, § 17(1). The constitution also prohibits lawmaking outside of the legislative process: "No law shall be enacted except by bill." *Id.*, ART. IV, § 17(2). "As [the framers] saw it, the people have a *right* to make the rules governing their lives through their elected representatives." NEIL GORSUCH, OVER RULED: THE HUMAN TOLL OF TOO

---

[1] *Serv. Emps. Int'l Union, Loc. 1 v. Vos*, 2020 WI 67, ¶98, 393 Wis. 2d 38, 946 N.W.2d 35 ("Administrative rules enacted pursuant to statutory rulemaking authority have the force and effect of law in Wisconsin.").

MUCH LAW 96 (2024). Nothing in the constitution permits the legislature to transfer the lawmaking power the People delegated to their elected representatives alone. What the governed have written, the government must obey.

¶79 The Wisconsin Constitution enshrines a first principle of self-governance—through delegated and non-transferable powers—articulated by John Locke more than three centuries ago and embraced by the framers of the United States Constitution:

> The legislative cannot transfer the power of making laws to any other hands: for *it being but a delegated power from the people*, they who have it cannot pass it over to others.

JOHN LOCKE, SECOND TREATISE OF GOVERNMENT § 141, 74–75 (C.B. Macpherson ed., 1980) (1690) (emphasis added). Rules dictated by others do not bind the People because the People never authorized anyone but the legislature to make them:

> And when the people have said, We will submit to rules, and be governed by *laws* made by such men, and in such forms, no body else can say other men shall make *laws* for them; nor can the people be bound by any *laws*, but such as are enacted by those whom they have chosen, and authorized to make *laws* for them.

*Id*. at 75. Those who claim the nondelegation principle never existed display a profound misunderstanding of the structural separation of powers, under which the People—not the government—bear the original and exclusive authority to decide what powers they will delegate and to whom:

> The power of the legislative, being derived from the people by a positive voluntary grant and institution, can be no other than what that positive grant conveyed, which being only to *make laws*, and *not to make legislators*, the legislative can have no power to transfer their authority of making laws, and place it in other hands.

*Id*. (emphasis added). In subdelegating its lawmaking power to bureaucrats, the legislature impermissibly makes "legislators" by whom the People never consented to be governed. Those who deem the

nondelegation principle a dead letter show grave disrespect for the People's sovereignty:

> The *legislative* neither must *nor can transfer the power of making laws* to any body else, or place it any where, but where the people have.

*Id.*, § 142 at 75. Originally understood, the Wisconsin Constitution prohibits each branch from subdelegating their vested powers, which this court recognized as early as 1875: "It is a settled maxim of constitutional law, that the power thus conferred upon the legislature cannot be delegated by that department to any other body or authority." *Slinger v. Henneman*, 38 Wis. 504, 509-10 (1875).

¶80 Informed by the lessons of history, the framers vested the legislative power exclusively in the legislature and prohibited its transfer to protect the People's liberty. "[William Blackstone] defined a tyrannical government as one in which 'the right both of making and of enforcing the laws, is vested in one and the same man, or one and the same body of men,' for 'wherever these two powers are united together, there can be no public liberty.'" *Dep't of Transp. v. Ass'n of Am. R.Rs.*, 575 U.S. 43, 73 (Thomas, J., concurring in the judgment) (quoting 1 W. BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 142 (1765)). "When the legislative and executive powers are united in the same person, or in the same body of magistrates, there can be no liberty[.]" MONTESQUIEU, THE SPIRIT OF THE LAWS, bk. XI, ch. 6, p. 151 (O. Piest ed., T. Nugent transl. 1949). Citing Montesquieu's admonition, James Madison explained "there can be no liberty, because apprehensions may arise lest *the same* monarch or senate should *enact* tyrannical laws, to *execute* them in a tyrannical manner." THE FEDERALIST NO. 47, at 326 (James Madison) (J. Cooke ed. 1961).

¶81 The majority rewrites the constitutional text to strangle "legislative action" while unleashing unconstrained executive rule, exposing the People to the very nightmare against which Madison warned. The majority says, "legislative action that alters the legal rights and duties of persons outside of the legislative branch triggers the requirements of bicameralism and presentment." Majority op., ¶39. Those provisions of the constitution, however, don't say anything about "legislative action"—they speak in terms of bills: "No law shall be enacted except by bill." WIS. CONST. ART. IV, § 17(2). "Every bill which shall have

passed the legislature shall, before it becomes a law, be presented to the governor." *Id.*, ART. V, § 10(1)(a). The framers erected these constitutional hurdles to protect the People from "the faculty and excess of law-making" which the founders viewed as "the diseases to which our governments are most liable." THE FEDERALIST NO. 62, at 417 (James Madison), *supra*. The "legislative action" the majority blocks, however, is not the imposition of rules restraining the People's freedom but the legislature's impediments to their infliction on the People—by the executive. The majority facilitates the spread of the disease by a different carrier.

¶82 This court once recognized "[t]here was no place for administrative agencies in the constitutional system of this country. They were not only unknown but undreamed of at the time the Constitution of the United States was formed as well as at the time most state Constitutions were adopted. Administrative law has been compelled to crowd its way into our legal system . . . ." *State ex rel. Wis. Inspection Bureau v. Whitman*, 196 Wis. 472, 494, 220 N.W. 929 (1928). Like other courts, however, our supreme court decided it was acceptable for the government to override the People's choice to disperse powers among three branches, tamper with the structural separation of powers to accommodate a fourth, and erase the nondelegable nature of the constitutional grants of power. "The concentration of power within an administrative leviathan clashes with the constitutional allocation of power among the elected and accountable branches of government at the expense of individual liberty." *Koschkee v. Taylor*, 2019 WI 76, ¶42, 387 Wis. 2d 552, 929 N.W.2d 600 (Rebecca Grassl Bradley, J., concurring).

¶83 The damage was done, as it often is, in the name of "necessity": "[T]here is an overpowering necessity for a modification of the doctrine of separation and nondelegation of powers of government. In the face of that necessity courts have upheld laws granting legislative power under the guise of the power to make rules and regulations . . . ." *Whitman*, 196 Wis. at 498. In the process, this court has allowed the administrative state to smother the constitutional safeguards the People adopted to protect their liberty. Despite its offenses against our constitution and the People from whom it derives its authority, our court has always recognized the power to make rules and regulations is the power to legislate.

4

¶84 Of course, it is the legislature that created the problem in the first instance by statutorily creating an administrative state the constitution never contemplated. In vesting the legislative power exclusively in the legislature, the framers understood "that the job of keeping the legislative power confined to the legislative branch couldn't be trusted to self-policing by Congress; often enough, legislators will face rational incentives to pass problems to the executive branch." *Gundy v. United States*, 588 U.S. 128, 156 (2019) (Gorsuch, J., dissenting). "What happens when Congress, weary of the hard business of legislating and facing strong incentives to pass the buck, cedes its lawmaking power, clearly and unmistakably, to an executive that craves it? No canon of construction can bar the way. Then, our anemic approach to legislative delegations . . . can permit the delegation to stand and move us all one step further from being citizens in a self-governing republic and one step closer to being subjects of quadrennial kings and long-tenured bureaucrats." *FCC v. Consumers' Rsch.*, No. 24-354, slip op. at 36 (U.S. June 27, 2025) (Gorsuch, J., dissenting) (citation omitted).

¶85 This court must be "assiduous in patrolling the borders between the branches" to preserve the constitution's "structural protection against depredations on our liberties." *Tetra Tech EC, Inc. v. DOR*, 2018 WI 75, ¶45, 382 Wis. 2d 496, 914 N.W.2d 21. The legislature erected checks against the exercise of power it unconstitutionally transferred to the executive, but the governor asks this court to dismantle them, and the majority obliges. When the government operates beyond its constitutional boundaries, anything goes—and the structural separation of powers continues to crumble.

¶86 The majority imperils more than the structural separation of powers (if that isn't bad enough). If the courts continue to consent to the redistribution of constitutional powers between the branches, then *all* constitutional provisions are susceptible to revision by the government, and the governed have lost their ability to govern themselves. In this case, the majority (once again)[2] tips the balance of power toward the executive branch at the expense of the People's representatives and the citizens' sovereignty. Constitutional revision by a handful of lawyers is as anti-

---

[2] *Evers v. Marklein*, 2024 WI 31, ¶57 n.2, 412 Wis. 2d 525, 8 N.W.3d 395 (*Marklein I*) (Rebecca Grassl Bradley, concurring).

democratic as it gets. The progressive justices of the United States Supreme Court "decr[y] an imperial Executive while embracing an imperial Judiciary." *Trump v. CASA, Inc.*, No. 24A884, slip op. at 23 (U.S. June 27, 2025). The progressive justices of the Wisconsin Supreme Court embrace both—for now. The constitutional parameters surrounding the exercise of each branch's power must be upheld regardless of which political party is in power.

¶87 In reaching its outcome, the majority preserves the "cooperative venture between the legislature and administrative agencies" blessed by this court in *Martinez v. Department of Industry, Labor, and Human Relations*, 165 Wis. 2d 687, 692, 478 N.W.2d 582 (1992), under which the government subjects the People to unconstitutional rule by bureaucrats. The majority, however, discards the inconvenient parts of the bargain struck by the legislature and the executive, under which the legislature "retain[ed] the right to review any rules promulgated under the delegated power." *Id.* at 698. The majority never explains why the legislative power may be statutorily reassigned to an administrative apparatus without violating the constitution, but the statutorily imposed *conditions* on such subdelegation somehow offend the constitution. There is no principled basis to say the legislature can do one but not the other.

¶88 Referencing Articles IV and V of the Wisconsin Constitution only in passing, the majority reiterates a principle we applied just last term: "[B]icameralism, and presentment . . . restrict the operation of the legislative power to those policies which meet the approval of three constituencies"—the assembly, the senate, and the governor—"or a supermajority of two." Majority op., ¶35 (citing *Evers v. Marklein*, 2024 WI 31, ¶13, 412 Wis. 2d 525, 8 N.W.3d 395 (*Marklein I*)). What restricts the power of the unelected bureaucrats to impose rules on the people of Wisconsin and penalize them for noncompliance? According to the majority, nothing at all.

¶89 "[M]odernly considered" bicameralism serves "to insure mature and deliberate consideration of, and to prevent precipitate action on proposed legislative measures." *Marklein I*, 412 Wis. 2d 525, ¶13 (quotation omitted). The original purpose for erecting hurdles throughout the lawmaking process, however, was to ensure the People's freedom to live in a society unburdened by arbitrary and oppressive rules dictated by

a king. The founders made lawmaking difficult by design,[3] with "detailed and arduous processes for new legislation" to serve as the very "bulwarks of liberty." *Gundy*, 588 U.S. at 154 (Gorsuch, J., dissenting). Because laws restrict the People's liberty, the framers designed lawmaking to promote deliberation, "to guard unpopular minorities from the tyranny of the majority," and to ensure "[t]he sovereign people would know, without ambiguity, whom to hold accountable for the laws they would have to follow." *Id.* at 155.

¶90    Assigning the lawmaking power to deliberative bodies elected by the People also ensures the rules imposed on us are "the product of widespread social consensus" rather than laws being "simply declared by a single person." *Id.* at 155–56. The subject matter of the battle waged between the legislature and the administrative state in this case showcases why the People entrusted their elected representatives with the lawmaking power, rather than unaccountable bureaucrats. Purporting to bind counselors, therapists, and social workers, the Marriage and Family Therapy, Professional Counseling, and Social Work Examining Board (the Board) decreed as "unprofessional conduct" the practice of "[e]mploying or promoting any intervention or method that has the purpose of attempting to change a person's sexual orientation or gender identity, including attempting to change behaviors or expressions of self or to reduce sexual or romantic attractions or feelings toward individuals of the same gender." Wis. Admin. Code MPSW § 20.02(25) (2022). Legislative resistance to administrative rulemaking in this area is but one battle within America's culture wars. Such decisions belong with the People, not unaccountable bureaucrats.[4] "To adapt the law to changing

---

[3] "Admittedly, the legislative process can be an arduous one. But that's no bug in the constitutional design: it is the very point of the design." *Gutierrez-Brizuela v. Lynch*, 834 F.3d 1142, 1151 (10th Cir. 2016) (Gorsuch, J., concurring); "[t]hese structural impediments to lawmaking were no bugs in the system but the point of the design: a deliberate and jealous effort to preserve room for individual liberty." *United States v. Nichols*, 784 F.3d 666, 670 (10th Cir. 2015) (Gorsuch, J., dissenting).

[4] The majority's choice to use polarizing terms like "cisgender" reveals which side the members of the majority favor in the culture wars. Majority op.,

circumstances . . . the collective wisdom of the people's representatives is needed." *Gutierrez-Brizuela v. Lynch*, 834 F.3d 1142, 1149 (10th Cir. 2016) (Gorsuch, J., concurring).

¶91     Despite the governor's entreaties, the majority stops short of declaring rulemaking something other than lawmaking, which would require overruling decades of precedent. It would also require the court to paint stripes on a horse and call it a zebra. The power to make laws means "the power to adopt generally applicable rules of conduct governing future actions by private persons—the power to 'prescrib[e] the rules by which the duties and rights of every citizen are to be regulated,' or the power to 'prescribe general rules for the government of society.'" *Marklein I*, 412 Wis. 2d 525, ¶51 (Rebecca Grassl Bradley, J., concurring) (quoting *Gundy*, 588 U.S. at 153 (Gorsuch, J., dissenting)) (citations omitted) (alteration in original). John Locke, whose work profoundly influenced the framers, used "rules" and "laws" interchangeably, understanding that "laws are not just the product of a legislative process but are more broadly the rules for society, *however made*." Larry Alexander & Saikrishna Prakesh, *Reports of the Nondelegation Doctrine's Death are Greatly Exaggerated*, 70 U. CHI. L. REV. 1297, 1322 (2003) (emphasis added).[5]

---

¶17 n.8. Naturally, the majority reaches an outcome aligned with the personal values of its members rather than one consonant with the constitution.

[5] Conceptions of "legislative power" underpinning the framers' understanding include those provided by Aristotle ("the one that deliberates about communal affairs." ARISTOTLE, POLITICS, bk. IV, ch. 14, at 103 (C.D.C. Reeve trans., Hackett Publ'g Co. ed. 2017)); Locke ("The legislative power is that, which has a right to direct how the force of the common-wealth shall be employed for preserving the community and the members of it." JOHN LOCKE, SECOND TREATISE OF GOVERNMENT, § 143, at 75 (C.B. Macpherson ed., 1980) (1690)); Montesquieu ("the [] magistrate enacts temporary or perpetual laws, and amends or abrogates those that have been already enacted." MONTESQUIEU, THE SPIRIT OF THE LAWS, bk. VI, ch. 6, at 151 (O. Piest ed., T. Nugent transl. 1949)); Blackstone (defining "law" as a generally applicable "rule of civil conduct prescribed by the supreme power in a state, commanding what is right and prohibiting what is wrong." *Ass'n of Am. R.Rs.*, 575 U.S. at 73 (Thomas, J., concurring in the judgment) (quoting 1 W. BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 44 (1765))); and Hamilton ("The legislature . . . prescribes the rules by which the duties and rights of every citizen are to be regulated." THE

¶92    For nearly 100 years, this court has recognized that "when administrative agencies promulgate rules, they are exercising legislative power that the legislature has chosen to delegate to them by statute." *Koschkee*, 387 Wis. 2d 552, ¶12 (citing *Whitman*, 196 Wis. at 505–06). Long ago, this court cautioned that when the legislature "delegate[s] to administrative agencies the authority to exercise such *legislative* power as is necessary to carry into effect the general legislative purpose" "[i]t only leads to confusion and error to say that the power to fill up the details and promulgate rules and regulations is not *legislative* power." *Whitman*, 196 Wis. at 505–06 (emphasis added). "If an executive or administrative officer has authority either by himself or acting with other officers to do the very thing that Congress might have done in the exercise of its legislative power, that is, make a rule of conduct for which a citizen may be penalized if he disobeys it, it is difficult to see how it can be said that the power exercised is in one case legislative and in the other case it is not." *Id*. at 496.

¶93    Given that administrative rulemaking is the exercise of subdelegated legislative power, the majority does not reconcile the constitutional conundrum it creates by erasing the legislature's check on the executive's use of the legislature's power. While the legislature must overcome the crucible of bicameralism and presentment in order to enact a law, the administrative apparatus of the executive branch may decree rules not only without surmounting the crucible, but without any legislative check on the exercise of the legislature's own power. The majority never explains how the constitution can permit the legislature to statutorily delegate its power, but prohibit the legislature from statutorily checking its exercise. There is no principled distinction to be drawn, and no principled basis upon which to uphold one law while striking the other.

¶94    The dissent in *Chadha* articulated the disparate treatment of the two branches under the standard this court adopts: "Under the Court's analysis, the Executive Branch and the independent agencies may

---

FEDERALIST NO. 78, at 522–23 (Alexander Hamilton), (J. Cooke ed. 1961)). Contemporary scholars concur: "The natural core of legislative power . . . was the power to make rules that bound or constrained subjects." PHILIP HAMBURGER, IS ADMINISTRATIVE LAW UNLAWFUL? 85 (2014).

make rules with the effect of law while Congress, in whom the Framers confided the legislative power, Art. I, § 1, may not exercise a veto which precludes such rules from having operative force. If the effective functioning of a complex modern government requires the delegation of vast authority which, by virtue of its breadth, is legislative or 'quasi-legislative' in character, I cannot accept that Article I—which is, after all, the source of the non-delegation doctrine—should forbid Congress from qualifying that grant with a legislative veto." *Immigr. & Naturalization Serv. v. Chadha*, 462 U.S. 919, 989 (1983) (White, J., dissenting). As long as the administrative state continues to exist, the courts should preserve checks on the exercise of power the legislature gives it. "Rather than build a government premised on the assumption that elites can and will apolitically discern for us all a single right answer to a particular policy question, the framers thought it safer and more consonant with human nature to proceed on an assumption that those who participate in government will be ambitious for power—and that their ambitions should not be efficiently unleashed but *always checked and balanced*." GORSUCH, *supra*, at 96–97 (emphasis added).

¶95 The majority's analysis begins (and ends) with *Chadha*. Wisconsin has a constitution, and it supplies a different answer than the one the majority gives. The constitution begins by acknowledging the inherent rights of the People, who consent to be governed only for the purpose of securing those rights: "All people are born equally free and independent, and have certain inherent rights; among these are life, liberty and the pursuit of happiness; to secure these rights, governments are instituted, deriving their just powers *from the consent of the governed*." WIS. CONST. ART. I, § 1 (emphasis added). The People chose to disperse power among three branches to prevent the concentration of power in one person or body. The legislative power is exclusively vested in a senate and assembly, the executive power is exclusively vested in a governor, and the judicial power is exclusively vested in the judiciary. *Id*., ART. IV, § 1; ART. V, § 1; ART. VII, § 2. The People didn't delegate *any* powers to unelected bureaucrats, much less the lawmaking power. "The Constitution promises that our elected representatives in [the legislature], and they alone, will make the laws that bind us." *FCC*, slip op. at 37 (Gorsuch, J., dissenting) (citation omitted).

¶96 The structural separation of powers is the "bedrock of the structure by which we secure liberty in both Wisconsin and the United States," *Gabler v. Crime Victims Rts. Bd.*, 2017 WI 67, ¶3, 376 Wis. 2d 147, 897 N.W.2d 384. The founders chose to disperse power among the

branches "not merely to assure effective government but to preserve individual freedom." *Morrison v. Olson*, 487 U.S. 654, 727 (1988) (Scalia, J., dissenting). The people of Wisconsin never consented to the legislative and executive branches negotiating a different arrangement, even if the judiciary acquiesces. Accordingly, "[w]hen the [g]overnment is called upon to perform a function that requires an exercise of legislative, executive, or judicial power, only the vested recipient of that power can perform it." *Marklein I*, 412 Wis. 2d 525, ¶49 (Rebecca Grassl Bradley, J., concurring) (quoting *Ass'n of Am. R.Rs.*, 575 U.S. at 68 (Thomas, J., concurring in the judgment)); *see also id.*, ¶49 n.1.

¶97 Rather than yielding to the political branches' reallocation of powers the People gave them, this court has an obligation to guard the constitutional borders the People themselves established to protect their freedom. No branch may give away its own power. "It is fundamental and undeniable that no one of the three branches of government can effectively delegate any of the powers which peculiarly and intrinsically belong to that branch." *Tetra Tech*, 382 Wis. 2d 496, ¶48 (lead op.) (cleaned up) (quoting *Rules of Court Case*, 204 Wis. 501, 503, 236 N.W. 717 (1931)). "Any attempt to abdicate a core power in any particular field, though valid in form, must, necessarily, be held void." *Id*. (cleaned up). This court is duty bound to "declare all acts contrary to the manifest tenor of the Constitution void[,]" lest "all the reservations of particular rights or privileges [] amount to nothing." *Marklein I*, 412 Wis. 2d 525, ¶46 (Rebecca Grassl Bradley, J., concurring) (quoting THE FEDERALIST NO. 78, at 524 (Alexander Hamilton), *supra*). If it takes seriously its solemn oath to support the constitution, this court must "retrieve the legislature's core lawmaking power from the administrative apparatus residing in the executive branch." *Marklein I*, 412 Wis. 2d 525, ¶47 (Rebecca Grassl Bradley, J., concurring).

¶98 During oral argument in this case, the administrative state was described as a "gentlemen's agreement" to disregard the constitution's text[6] and "water under the bridge"[7] due to decades of

---

[6] Oral argument in *Evers v. Marklein*, No. Number 23AP2020-OA, held Jan. 16, 2025, available on Wisconsin Eye https://wiseye.org/2025/01/16/wisconsin-supreme-court-tony-evers-v-howard-marklein/ (statement at 55:15).

[7] Oral argument in *Evers v. Marklein*, *supra*, at 56:50.

precedent ignoring the constitution in the name of efficient government over our complex society. The constitution does not contain any exceptions to the vesting of distinct powers in different branches, nor do the vesting clauses expire after a period of abandonment by the government. This court has a duty to declare what the law is regardless of past practices, handshake deals, or inter-branch cooperation to the contrary. "[I]llusory 'limits drawn by the judiciary'" are an unacceptable substitute for the restrictions enshrined in our constitution's text. *Id.*, ¶53 (citations omitted). The members of this court, past and present, have "been derelict in our duties"[8] in allowing subdelegation to continue, following suit with the United States Supreme Court. "When [the legislature] has willingly surrendered its power to the Executive Branch, this Court's responses can only be described as feeble. Always, to be sure, the Court dutifully recites the creed that 'legislative power belongs to the legislative branch, and to no other.' Too often, though, these professions amount (at most) to faith without works, and the results are not hard to see." *FCC*, slip op. at 35–36 (Gorsuch, J., dissenting) (cleaned up).

¶99 Nearly 100 years ago, this court acknowledged the constitution does not permit the legislature to delegate its lawmaking powers to another branch, but nevertheless capitulated to the concentration of power in the administrative leviathan as a necessary appendage to the government:

> The old doctrine prohibiting the delegation of legislative power has virtually retired from the field and given up the fight. There will be no withdrawal from these experiments. We shall go on; we shall expand them, whether we approve theoretically or not, because such agencies furnish protection to rights and obstacles to wrong doing which under our new social and industrial conditions cannot be practically

---

[8] *Wis. Legislature v. Palm*, 2020 WI 42, ¶101, 391 Wis. 2d 497, 942 N.W.2d 900 (Kelly, J., concurring) ("The border between the legislature and the executive is maintained, or at least it once was, under the aegis of the nondelegation doctrine. . . . If [the nondelegation doctrine is dead] in Wisconsin, it is not because we never recognized it or outright rejected it, but because we allowed it to fall into desuetude. To the extent that has happened, we have been derelict in our duties.").

accomplished by the old and simple procedure of legislatures and courts as in the last generation.

*Whitman*, 196 Wis. at 498. Propping up the administrative behemoth in the name of efficiency threatens our constitution's structural integrity and imperils the People's liberty. Those who respect the People's sovereignty have not retired from the field, nor have we given up the fight.[9]

\* \* \*

¶100 "[I]n America THE LAW IS KING. For as in absolute governments the King is law, so in free countries the law *ought* to be King; and there ought to be no other." THOMAS PAINE, COMMON SENSE (1776), *reprinted in* RIGHTS OF MAN, COMMON SENSE, AND OTHER POLITICAL WRITINGS 34 (Oxford University Press ed., 2008).

¶101 The legislature lacks the authority to give its lawmaking power to another branch; the Wisconsin Constitution does not allow such reassignments even if the legislature prefers to pass the hard political choices to unaccountable bureaucrats. Precedent blessing this unconstitutional arrangement cannot override the constitution, the supreme law under which the People gave each branch its power. *See Wis. Mfrs. & Com., Inc. v. DNR*, 2025 WI 26, ¶70, __ Wis. 2d __, __ N.W.3d __ (Rebecca Grassl Bradley, J., dissenting). So long as the judiciary continues to tolerate this unconstitutional transfer of power, the majority's decision to remove a legislative check on administrative lawmaking ensures "the fundamental policy decisions in our society will be made" by "appointed official[s]" rather than "the body immediately responsible to the people." *Chadha*, 462 U.S. at 1002–03 (White, J., dissenting). Whatever this arrangement is, it is not constitutional. The People never consented to be ruled by bureaucratic overlords. I dissent.

---

[9] *See Wis. Mfrs. & Com., Inc. v. DNR*, 2025 WI 26, ¶¶69–89, __ Wis. 2d __, __ N.W.3d __ (Rebecca Grassl Bradley, J., dissenting); *Becker v. Dane Cnty.*, 2022 WI 63, ¶¶73–149, 403 Wis. 2d 424, 977 N.W.2d 390 (Rebecca Grassl Bradley, J., dissenting); *Fabick v. Evers*, 2021 WI 28, ¶¶46-73, 396 Wis. 2d 231, 956 N.W.2d 856 (Rebecca Grassl Bradley, J., concurring); *Palm*, 391 Wis. 2d 497, ¶¶66–86 (Rebecca Grassl Bradley, J., concurring); *Koschkee v. Taylor*, 2019 WI 76, ¶¶42–57, 387 Wis. 2d 552, 929 N.W.2d 600 (Rebecca Grassl Bradley, J., concurring).